**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ─────────────────── | : | |
| MATAN SHELTON, | : | |
| | : | Civil No. 09-6521 (JAP) |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | **O P I N I O N** |
| GEORGE HAYMAN, et al., | : | |
| | : | |
| Respondents. | : | |
| ─────────────────── | : | |

**APPEARANCES:**

Matan Shelton, <u>Pro Se</u>
#402996/975331
New Jersey State Prison
PO Box 861
Trenton, NJ 08625-0861

Michael Andrew Nardelli, Esq.
Mercer County Prosecutor's Office
209 South Broad Street
Trenton, NJ 08650
Attorney for Respondents

**PISANO, District Judge**

    This matter is before the Court on Petitioner's petition for a writ of habeas petition, filed pursuant to 28 U.S.C. § 2254. For the following reasons, the petition will be denied, without prejudice.

## BACKGROUND

A.   **Factual Background**

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division ("Appellate Division"), in Petitioner's direct appeal.[1]

> The State's proofs at trial were sufficient for a reasonable jury to find the following facts. Harris was a seventy-five-year-old woman who lived alone in the City of Trenton. On November 13, 1996, defendant went to Harris' home to steal her car. Defendant wanted to sell the car and utilize the proceeds to purchase drugs. Defendant had been drinking alcohol and was high on Phencyclidine at the time. Harris and defendant were acquainted because defendant performed chores around Harris' home. Harris invited defendant into the house for a cup of tea. As a result of defendant's drug use, he was acting strangely and Harris became concerned and asked defendant to leave. Defendant told Harris that he wanted her car keys, which she refused to turn over.
>
> Harris then attempted to telephone her husband but defendant pushed her to the floor and began to kick and beat her brutally. Because she was screaming, defendant stuffed the scarf she was wearing into her mouth to quiet her screams. After she stopped moving, defendant moved Harris' body into a pantry near the kitchen.
>
> Defendant took Harris' car keys and the gold hoop earrings she was wearing. He then stole her car and drove it to New York City. After determining it was too late to attempt to sell the car to a "chop shop," defendant left the car in New York City and returned to Trenton by train because he was concerned about whether Harris' body had been discovered.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

On November 14, the next day, defendant returned to New York City where he recovered Harris' car. He then drove the car to 123rd Street and 7th Avenue where he met Hassan Stevens. Stevens knew defendant from earlier trips defendant had taken to New York to purchase drugs. Defendant tried unsuccessfully to sell the car to Stevens and another individual for $100.

Defendant and Stevens then decided to take the car to a "chop shop" and share the proceeds. While defendant and Stevens were driving, defendant told Stevens that he had stolen the car. During the drive, defendant also wore brown working gloves and put them on every time he entered the car and took them off when he exited the car.

After visiting approximately four or five different places, defendant and Stevens were unable to sell the car. Defendant told Stevens that he could keep the car and defendant returned to Trenton by train.

Meanwhile, during the same day, Myrna Harris Taylor and Rosalyn Higganbotham, Harris' daughters, both unsuccessfully attempted to telephone their mother. While Harris lived by herself, she was visited regularly by her husband, John Harris, who lived in the area. Myrna called her father and sister, Rosalyn, to determine if they knew of Harris' whereabouts. They did not know where she was. Myrna and her daughter, Yvonna, went to Harris' home to determine if there was any problem. After searching the premises, they discovered Harris' body in the pantry near the kitchen. Myrna then called the police and the rest of her family.

Harris' family informed the police that defendant, who they knew as "Blinky," had done yard work for Harris. They gave the police defendant's telephone number and the name of the street where he lived. The family did not know the exact address. Harris' family also gave police a description of Harris' car, which was missing. In turn, Detective Edgar Rios of the Trenton Police Department put out a local and national alert for Harris' car.

While the police were conducting their investigation of the murder, Stevens was driving Harris' car in New York City. As Stevens was parked, he was approached by police and a high speed chase ensued.

Stevens eventually crashed the car and was captured and arrested by police. At approximately 12:40 a.m. on November 15, 1996, the New York City Police Department notified the Trenton Police Department that Harris' car had been recovered.

Officers from the Trenton Police Department and Mercer County Prosecutor's Office went immediately to New York and interviewed Stevens. Stevens told investigators that he had obtained the car from a man he knew as "Blinky," later identified as defendant. Stevens also identified defendant from an array of photographs.

The information that the Trenton Police received from Harris' family and Stevens caused Detective Scott Connor to telephone defendant's home and leave a message for him to contact the police. Detective Connor later went to defendant's home and left the same message.

At approximately 4:00 a.m. on November 15, 1996, defendant contacted the Trenton Police Department by telephone. Defendant was told that the police were investigating the murder of Harris and wanted to speak to him to determine if he had any information. At approximately 4:30 a.m., defendant voluntarily arrived at the Trenton Police Department.

Defendant was escorted to an interview room, given coffee, and asked if he could be patient until the detectives had an opportunity to speak with him. The interview room was an eight by eight room containing a square table and two chairs. The room had no windows and contained a wooden door which was closed and locked.

At approximately 5:30 a.m., Lieutenant Robert Cochran arrived at Trenton Police Headquarters and conducted a warrant check on defendant. Lieutenant Cochran uncovered an outstanding municipal warrant issued for defendant. The warrant was discovered at approximately 5:45 a.m. but was not served upon defendant because the police did not want to antagonize defendant or make him hostile until they had more information about the murder.

4

At approximately 6:00 a.m., Detective Connor and Captain Golden entered the interview room to speak with defendant. Defendant was advised of his Miranda rights and signed a form acknowledging that he understood those rights. Defendant then waived his Miranda rights. During the reading of defendant's rights, he did not state that he wanted an attorney present nor did he indicate that he did not wish to speak to the detectives. At approximately 6:10 a.m., defendant was asked if he had information regarding the murder of Harris. Defendant responded that he had no knowledge or information regarding Harris' murder. Defendant was not asked any other questions at that time, but was told that someone would be back to speak to him later. Subsequently, the two officers left and defendant remained in the interview room. Defendant was checked on periodically by officers and slept for most of the time between the initial interview at 6:00 a.m. until the second interview later that afternoon.

At 1:30 p.m., Detective Robert Tedder, one of the officers who had gone to New York to interview Stevens, returned to Trenton with Stevens. At 2:30 p.m., Detective Edgar Rios took a formal statement from Stevens.

At 3:30 p.m., Detective Tedder began his formal interview of defendant. Detective Tedder readvised defendant of his Miranda rights. Defendant chose to waive those rights and to speak to Detective Tedder. At first, defendant admitted to knowing Harris, but denied any involvement with the murder. Defendant was then confronted with the fact that the police had a witness and knowledge that defendant was in New York with Harris' car. Detective Tedder then left the interview room and returned with a photograph of Stevens and presented it to defendant. At this point, defendant replied that the fact that he had the car did not mean he had killed Harris. He said perhaps someone else killed her and he just happened to find the car on the street. At approximately 5:15 p.m., Detective Tedder decided to take a break. Defendant was given food to eat.

At 6:30 p.m. Detective Tedder resumed the interview. At this point, defendant admitted that he had killed Harris and gave a detailed account of the events of the murder. The second interview took

approximately one hour and fifteen minutes and ended at
approximately 8:00 p.m.

Defendant agreed to give a written statement and
Detective Quinton June was directed to take the written
statement. When Detective June entered the interview
room, defendant stated that he did not want to give a
written statement. Detective June then left the room to
consult with one of his supervisors and returned to the
interview room and asked defendant why he did not wish
to give a written statement. Defendant told Detective
June that he was confused and did not know what to do.
During this time, however, defendant did not refuse to
speak to Detective June, who told defendant that it was
probably in his best interest to get his side of the
story on paper. Defendant agreed and the written
statement followed. At the completion of the written
statement, defendant reviewed and signed it. During his
interaction with Detective June, defendant did not ask
to speak with an attorney nor did he state that he did
not wish to speak to the officer. He only initially
said he did not wish to give a written statement.

Dr. Raafat Ahmad, the chief medical examiner for
Mercer County conducted the autopsy on Harris' body.
Dr. Ahmad testified that one end of a gray scarf had
been forcibly stuffed down into Harris' throat and
larynx making it impossible for her to breath. There
were also numerous external contusions on Harris' body
indicating that Harris had been badly "beaten and
gagged." In conclusion, the examiner stated that
Harris' death was brought on by "massive extensive
injuries to the neck, chest, head and smothering" by
the scarf in her throat.

Based on the foregoing, the jury convicted
defendant on all the charges. This appeal follows.

State v. Shelton, 344 N.J. Super 505, 510-515 (App. Div. 2001)

(Respondents' Exhibit "R" 4)(internal footnote omitted).

B.    **Procedural Background**

On July 11, 1997, a Mercer County Grand Jury charged

Petitioner with murder, felony murder, first degree robbery,

theft, and possession of a weapon, in violation of New Jersey state law.  After a Miranda hearing and pretrial motions, a jury trial was conducted, and on November 17, 1999, Petitioner was found guilty of all counts of the indictment.  On February 4, 2000, Petitioner was sentenced to an aggregate term of life imprisonment, with a 30-year period of parole ineligibility. Petitioner was also found guilty of probation violations and was sentenced to consecutive five year imprisonment terms (R2).  On October 26, 2001, Petitioner's convictions and sentence were affirmed (R4).  On January 8, 2002, the New Jersey Supreme Court denied certification to review Petitioner's appeal (R5).

On January 7, 2003, Petitioner filed a pro se petition for post-conviction relief ("PCR") (R6).  On August 15, 2006, the PCR motion was denied (R11).  The Appellate Division affirmed the denial of PCR on October 2, 2009 (R14), and the New Jersey Supreme Court denied certification on January 26, 2010 (R15).

While the petition for certification was pending in the New Jersey Supreme Court, Petitioner filed in this District Court, on December 29, 2009, the instant petition for a writ of habeas corpus (docket entry 1).  In response to this Court's Order, filed pursuant to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), Petitioner stated that he wished to hold his petition in abeyance until the New Jersey Supreme Court decided his petition for certification (docket entry 4).  However, two months later, on

7

April 6, 2010, Petitioner filed a letter stating that the Supreme Court had denied his petition for certification and that "at this time . . . [he] had in fact exhausted all his state appeals" (docket entry 5).

This Court ordered the Clerk to serve the Respondents (docket entry 6).  On December 28, 2010, Respondents filed the answer to the complaint, and the state court record.  Petitioner was served with the answer (docket entry 44), but did not file a reply.

In his petition, Petitioner argues that "an issue perhaps, will surface where respondents and/or petition will have a dispute in the adequacy of the state court[] record and petitioner reserve[s] the right to refute same in order for this court to get a clear view of petitioner's meritorious constitutional rights violations that hinder a fair jury trial contrary to the U.S. Const. ...."  (Pet., Point I, p. 7).  Petitioner, citing Crawford v. Washington, 541 U.S. 36 (2004), further challenges the state court rulings regarding his right to confrontation, and, citing Miranda v. Arizona, 384 U.S. 436 (1966), challenges "the blown-up alleged written statement.  Petitioner also argues that the jury instructions were incorrect, warranting habeas relief.  (Pet., Point II, pp. 8-9).  Finally, although somewhat unclear, Petitioner seems to argue that he has

meritorious claims that should be litigated, despite delay in the state court proceedings.   (Pet., Point III, p. 10).

**DISCUSSION**

**A.   Standard of Review**

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless

arrives at a result different from [the Court's] precedent."
Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J.,
for the Court, Part II).  A state court decision "involve[s] an
unreasonable application" of federal law "if the state court
identifies the correct governing legal rule from [the Supreme]
Court's cases but unreasonably applies it to the facts of the
particular state prisoner's case," and may involve an
"unreasonable application" of federal law "if the state court
either unreasonably extends a legal principle from [the Supreme
Court's] precedent to a new context where it should not apply or
unreasonably refuses to extend that principle to a new context
where it should apply," (although the Supreme Court expressly
declined to decide the latter).  Id. at 407-09.  To be an
"unreasonable application" of clearly established federal law,
the state court's application must be objectively unreasonable.
Id. at 409.  In determining whether the state court's application
of Supreme Court precedent was objectively unreasonable, a habeas
court may consider the decisions of inferior federal courts.  See
Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

The deference required by § 2254(d) applies without regard
to whether the state court cites to Supreme Court or other
federal case law, "as long as the reasoning of the state court
does not contradict relevant Supreme Court precedent."  Priester
v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v.

10

Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierlev, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

## B.   Petitioner's Claims in Points I and III.

Points I and III of Petitioner's petition are not sufficient to warrant habeas relief.  As noted, in Point I, Petitioner states that he reserves the right to challenge the adequacy of the record.  However, "a determination of a factual issue made by a State court shall be presumed correct."  28 U.S.C.  2254(e)(1). Petitioner has not rebutted the presumption of correctness by clear and convincing evidence.  See id.; see, e.g., Miller-El v. Dretke, 545 U.S. 231, 240 (2005); Affinito v. Hendricks, 366 F.3d 252, 256-57 (3d Cir. 2004), cert. denied, 545 U.S. 1057 (2005).

As to Point III, Petitioner appears concerned with the delay in filing his petition.  Respondents concede that the petition is not time-barred (Answer, ¶ 31).

11

C.   **Petitioner's Claims in Point II.**

Petitioner's claims in Point II include a claim that his right to confrontation and cross-examination was violated; that Miranda was not properly applied to his case; and that jury instructions were inadequate.

1.   Right to Confrontation and Cross-Examination

Petitioner cites Crawford v. Washington, 541 U.S. 36 (2004) and Davis v. Washington, 547 U.S. 813 (2006).

It is well-established that the violation of a right created by state law is not cognizable as a basis for federal habeas relief.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (quoting Lewis v. Jeffers, 497 U.S. 764, 680 (1990))).  Accordingly, Petitioner cannot obtain relief for any errors in state law evidentiary rulings, unless they rise to the level of a deprivation of due process.  See Estelle, 502 U.S. at 70 ("'the Due Process Clause guarantees fundamental elements of fairness in a criminal trial'") (quoting Spencer v. Texas, 385 U.S. 554, 563-64 (1967)).

For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial.  See Keller v. Larkins, 251 F.3d. 408,

413 (3d Cir. 2001).  Even so, a review of the record shows no evidentiary error on behalf of the trial court.

In further examining Petitioner's claim, this Court points out that the Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  The Supreme Court has traced the historical roots of the Confrontation Clause and has emphasized that not all hearsay implicates the Confrontation Clause.  In <u>Crawford</u>, the Supreme Court stated:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.  Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.

<u>Crawford</u>, 541 U.S. at 68.

Here, a review of the record reveals that "the record is barren of any evidence the State presented the equivalent of testimonial evidence from a witness that did not testify at [Petitioner's] trial in contravention of the holdings in [<u>Crawford</u> and <u>Davis</u>]."  (Answer, pp. 11-12).

Petitioner has not demonstrated that the actions of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  As such, this ground related to trial court error will be denied.

2.  *Miranda* Claims

Petitioner argues that the trial court erroneously applied Miranda v. Arizona, supra.  Petitioner presented this argument to the Appellate Division in his direct appeal.  The Appellate Division found that Petitioner's written statement should not have been admitted at trial; however, the oral admissions were properly admitted.  The Appellate Division found that any error in admitting the written statements was "harmless given the evidence of defendant's guilt."  Shelton, 344 N.J. Super at 517-18.  The Appellate Division set forth the evidence at trial and explained this ruling:

> Here, defendant gave oral confessions to both Detectives Tedder and June. He only balked at giving a written statement to Detective June. Further, both the oral and written statements were the same in terms of inculpating defendant in the murder. In addition, there was the testimony from Stevens, who drove around with defendant in Harris' car in an attempt to sell it. During this time, defendant kept gloves on his hands while he was in the car and removed them when he exited the car. Defendant admitted to Stevens that he had stolen the car. Despite evidence that defendant may have been able to steal cars in other ways, he had the key to Harris' car. It was Harris' refusal to give defendant her car keys that led to his rage and brutal beating of Harris which resulted in her death.

14

      Moreover, although the presence of the blown-up written confession in the jury room during deliberations was error here, we fail to see what the jury learned from the document that it did not already know from defendant's properly admitted oral confessions. "[T]he jury here 'learned no more from the improperly admitted confession than it did from the properly admitted one,' since the oral and written confessions set forth essentially the same story." U.S. v. Johnson, 816 F.2d 918, 923 (3d Cir. 1987) (quoting Bryant v. Vose, 785 F.2d 364, 367 (1st Cir. 1986)). We conclude that the admission of the written statement was not "clearly capable of producing an unjust result." R. 2:10-2.

Id. at 518.

      The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  The Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination.  See Malloy v. Hogan, 378 U.S. 1, 8 (1964). In Miranda v. Arizona, 384 U.S. 436 (1966), the Court held that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467.  When police ask questions of a suspect in custody without administering the required warnings, Miranda dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief.  See Oregon v. Elstad, 470 U.S. 298, 317 (1985).  Thus, a confession taken during a custodial interrogation without the

provision of Miranda warnings violates the privilege against
self-incrimination.  See Thompson v. Keohane, 516 U.S. 99 (1995).

"To safeguard the uncounseled individual's Fifth Amendment
privilege against self-incrimination, the Miranda Court held,
suspects interrogated while in police custody must be told that
they have a right to remain silent, that anything they say may be
used against them in court, and that they are entitled to the
presence of an attorney, either retained or appointed, at the
interrogation." Thompson, 516 U.S. at 107; Miranda, 384 U.S. at
479.  The Miranda Court outlined the procedures to be followed
after the police provide these warnings.  If the accused requests
counsel, then "interrogation must cease until an attorney is
present."  Miranda, 384 U.S. at 474.

In this case, the state courts reasonably applied the
mandates of Miranda to Petitioner's case.  In fact, the Appellate
Division found that Petitioner's written confession should not
have been admitted at trial.  That the state courts found, based
on New Jersey Court Rule 2:10-1 that the error was harmless as
opposed to reversible, does not warrant habeas relief.

Petitioner has not demonstrated that the actions of the
state courts "resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United
States" or "resulted in a decision that was based on an

16

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." As such, this ground related to Petitioner's statements will be denied.

3.  <u>Jury Instructions Claim</u>

In Point II, Petitioner argues that the jury instructions were inadequate. It appears that these claims were presented to the Appellate Division on direct appeal. Citing <u>State v. Hampton</u>, 61 N.J. 250, 272 (1972) and <u>State v. Spruill</u>, 16 N.J. 73 (1954), Petitioner argues that the charge was inadequate and that a <u>Spruill</u> charge should have been issued to counsel the jury regarding accomplice testimony.

With regard to the jury charges, the Appellate Division found:

> The reasonable doubt charge was consistent with the holding of our Supreme Court in <u>State v. Medina</u>. Defendant has failed to demonstrate that error, plain or otherwise, occurred in this regard.
>
> We also conclude that the judge's charge pursuant to <u>State v. Hampton</u>, 61 N.J. 250, 294 A.2d 23 (1972), was adequate. Again, no error "clearly capable of producing an unjust result" happened in this context. R. 2:10-2.
>
> Defendant also asserts as plain error the judge's failure to, *sua sponte*, issue a charge pursuant to <u>State v. Spruill</u>. A defendant is entitled to request a charge that counsels the jury to carefully scrutinize and assess the evidence provided by an accomplice in light of the accomplice's special interest in the case. Further, a judge may give a <u>Spruill</u> charge *sua sponte* if he or she thinks it is advisable under the circumstances. It is, however, "generally not wise to give such a charge absent a request because of possible prejudice to defendant." Clearly "it is not error, let

17

> alone plain error, for a trial judge to fail to give
> this cautionary comment where it has not been
> requested."

Shelton, 344 N.J. Super. at 519-20 (internal citations omitted).

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing
> instruction by itself so infected the entire trial that
> the resulting conviction violates due process." It is
> well established that the instruction "may not be
> judged in artificial isolation," but must be considered
> in the context of the instructions as a whole and the
> trial record. In addition, in reviewing an ambiguous
> instruction ..., we inquire "whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way" that violates the
> Constitution. And we also bear in mind our previous
> admonition that we "have defined the category of
> infractions that violate 'fundamental fairness' very
> narrowly." "Beyond the specific guarantees enumerated
> in the Bill of Rights, the Due Process Clause has
> limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted).  Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law."  Smith v. Horn, 120 F.3d 400, 416 (1997), cert. denied, 522 U.S. 1109 (1998).  See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

18

charged"); <u>Sandstrom v. Montana</u>, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

The record reveals that here, Petitioner's jury was charged with the reasonable doubt standard. (R25). The trial judge charged:

> Let me talk to you, charge you again with regard to some of the principles of criminal law. First, the defendant, Matan Shelton, as are all defendants in all criminal cases, he is presumed to be innocent until proven guilty beyond a reasonable doubt. That presumption of innocence continues, as you know, through out the entire trial of the case. It was here when you started the trial. It was here during th presentation of evidence. It exists now. The presumption of innocence exists when 12 of you go into the jury room. It is only extinguished if 12 jurors agree unanimously the State has proved each element of a given charge beyond a reasonable doubt. If the 12 jurors are so satisfied that the State has met its burden of proof under our law, why then the finding, of course, would be that of guilt as to that particular charge and the presumption of innocence no longer obtains [sic]. It is extinguished. That's the only way presumption of innocence under our law is extinguished.
>
> The burden of proof is on the State and as I mentioned, it never shifts in a criminal case. It remains on the State through out the entire trial of the case. There is no burden of proof that is imposed on the defendant in a criminal trial. He is not obliged to prove his innocence. Therefore, unless the State has proved an offense charged and each of the elements, as I mentioned that to you, beyond a reasonable doubt, the defendant must be found not guilty.

(R25, Trial Transcript, pp. 14-15).  It is clear from a review of the charge, that the charge did not lift the burden of proof.

As noted, there was substantial evidence to convict Petitioner of the crimes charged.  That the jury chose to find Petitioner guilty based on the State's case does not prove that the trial was unfair, or that Petitioner's constitutional rights were violated.  This ground for habeas relief must be denied.

**D.  Denial, Without Prejudice**

This Court notes that since the beginning of this habeas litigation, Petitioner asked that his petition be held in abeyance, pending the New Jersey Supreme Court decision on his petition for certification concerning the appeal of his PCR denial.  When Petitioner wrote the Court that the Supreme Court had denied certification, this Court ordered Respondents to answer.  Respondents have so answered, and Petitioner has not objected to their answer or filed any reply.

However, this Court finds that it is possible that Petitioner did not have the opportunity to present all of the claims that he wished this Court to consider at the time the Order to Answer was issued.  Therefore, if Petitioner has additional claims that he wished to present to this Court, he may move to reopen this case and attach a supplemental petition containing those claims.  Upon so moving, Respondents will be permitted time to file a supplemental answer, and this Court will

order the Clerk to reopen this case and will consider any additional claims concerning the instant judgment of conviction.

## CERTIFICATE OF APPEALABILITY

The Court denies a certificate of appealability as to the claims examined in this Opinion because Petitioner has not made "a substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2).  See Miller-El v. Cockrell, 537 U.S. 322 (2003).

## CONCLUSION

Based on the foregoing, Petitioner's petition for a writ of habeas corpus is denied, without prejudice.  An appropriate Order accompanies this Opinion.


/s/ Joel A. Pisano
JOEL A. PISANO
United States District Judge


Dated: February 8, 2012